May it please the Court, Gregory Phillips on behalf of Appellants. The issue presented by this appeal is whether the doctrine of aesthetic functionality as opposed to utilitarian functionality has any viability in this circuit when applied to distinctive source-identifying trademarks. In Flick's billiards, a brilliant and scholarly opinion, this Court held that functionality has been limited if not rejected in favor of the utilitarian functionality test and quoted Professor McCarthy that aesthetic functionality is an oxymoron and that ornamental aesthetic designs are the antithesis of utilitarian designs. And when you think about the fact Is that in the context of trade dress in the Flick's billiard case? It was in the context of trade dress, Your Honor, where I think the district court turned that point on its head. In a trade dress case, as Your Honor knows, you have to prove functionality or non-functionality as one of the elements of your design. Where you have a federal trademark registration for an arbitrary or coin phrase like Audi or the Ring logos, you don't have to prove functionality or non-functionality. That's not an issue. So we believe that Flick's billiards' rejection of aesthetic functionality in a trade dress case or that if you apply Flick's billiards to a trademark case, the argument for rejecting aesthetic functionality is even stronger. And when you think about, for example, a license plate frame, what utilitarian functionality is all about is that it holds the license plate on the car. And if Volkswagen came in and got a design mark for a license plate frame, there might be an issue about utilitarian functionality, because there's only so many shapes you can make for a license plate frame. But the issue here is putting the logo on the license plate frame. And you don't need a logo on a license plate frame. They could have put an automotive gold logo on the license plate frame, but instead they chose a Volkswagen or an Audi logo, and that has nothing to do with utilitarian functionality. And Volkswagen and Audi submit that until aesthetic functionality is buried once and for all, we'll continue to provide a defense and refuge for counterfeiters such as automotive gold, and continue to do so. But I don't think, well, we can't bury it once and for all, so to speak, as you said, in light of Qualitex and Trafix from the Supreme Court, both cases talk about aesthetic functionality, although not in this context, in, you know, color and some other. So as a concept, I'm a little bit baffled by why you think to win your case or to make your argument, you need to, quote, bury it. Well, there's a difference, Your Honor, between aesthetic functionality and functionality. For example, in Trafix, the issue was the sign that would blow in the wind and whether you could design it. And there is a functionality argument there. Aesthetic functionality deals with the intrinsic value of a trademark, the argument that a Rolex counterfeiter would make selling a Rolex watch on the street corner, saying, we don't put the trademark Rolex on the wristwatch for a source-identifying function. We put that on there because people want to have Rolex for an aesthetic function to make them look good. And we all know that that argument doesn't fly. And the ‑‑ That's why, what, are you saying that, you know, it's a little hard to kind of parse these Supreme Court cases completely, but if you have a source-identifying mark where it's used in an identical fashion and it's not functional per se, you're saying that then the doctrine doesn't apply. Yes. And a good example I came up with in preparing for oral argument, I'm an avid golfer and I like Tiger Woods, so I have my Nike golf shoes, I have my Nike golf pants, my Nike golf hat with the swoosh on it, my Nike golf shirt, I even have Nike golf clubs, and I want a Nike golf ball to accessorize my accessories. And somebody comes along and says, well, I'm going to make a golf ball and I'm going to put the Nike swoosh on it, but the reason I'm doing that is not, and I'm even going to put a disclaimer on the golf ball and on the packaging that this golf ball is not manufactured or endorsed by Nike, the reason I'm putting the Nike swoosh on this golf ball is because I know that people like Mr. Phillips like to accessorize their accessories and look good. And that's the only reason I'm putting the Nike swoosh on my golf ball. And under what the district court did, the district court bought that argument. And what happens is you have people like Automotive Gold, and let's be clear about this, Automotive Gold knows what it's doing. It has trademark licenses with Honda, with General Motors. In fact, Your Honor, if you look at exhibit two or page 273 of the excerpts of record, which is in volume two, it's Automotive Gold's Honda advertisement. And it has the Honda trademarks here, the license plate frames. And down at the bottom, if you look at it, it says, Honda emblems and designs are trademarks of American Honda Motor Company and used under license by Automotive Gold, Inc., Tucson, Arizona. They know what they're doing. They have trademark licenses with other automobile manufacturers, but when they can't get one with Volkswagen or Audi, they go out and they knock off the marks, and then they come in and they make four arguments. First, aesthetic functionality, and if you carry aesthetic functionality for trademarks, I'm not talking about trade dress or the functionality of a product, but just for the Rolex trademark, if you carry that to its logical conclusion, it eviscerates the Lanham Act. It allows the Rolex counterfeiter to say, I put that on there for the aesthetic function of people looking good, not to indicate source. They make another argument, which is a disclaimer argument. And my intellectual property professor taught us that in the counterfeiting context, disclaimers are nothing more than an admission of liability or that the public will be confused. A Rolex counterfeiter can put on the back of his watch, this is not a real Rolex, or put on the packaging, this is not a real Rolex. And if you accept that defense, he's insulated from liability from trademark infringement. And if you look at the- Of course, there is the famous case from one of those New York vendors where they had the Rolex watch and everybody said, well, it's five bucks. Of course, the consumer knew it wasn't a Rolex watch, no confusion, no harm, no fault, but that isn't my answer. You're right, Your Honor, but that deals with, say, point-of-sale confusion. There's also wholesale confusion where somebody is sitting next to that guy on the airplane and looks over and says, man, that Rolex watch is a piece of crap. I'm surprised Rolex makes stuff like that. I'm never going to buy a Rolex watch. So the Lanham Act protects the whole spectrum, not just point of sale. But if you look at their disclaimer, and this is on page 244, their disclaimer is priceless. It says, this product may or may not be authorized by the vehicle manufacturer. Please see the label on the part or package for details. So at least one of the disclaimers they use couldn't be more confusing. But I think it's important to point out that in the Nike golf ball example, if the guy who knocks off the Nike golf ball puts on a disclaimer that this is not really manufactured by Nike, I don't think that's a defense under the trademark laws. The third argument that they make is that Volkswagen and Audi are being anti-competitive. Because it would be like the guy who knocks off the Nike golf ball coming in and says, I can't compete in the market for Nike golf balls, because I can't put Nike on my golf balls. Well, the relevant market is not Nike golf balls. The relevant market is golf balls. And he can put an automotive gold logo on his golf ball. He can put whatever logo he chooses and compete just fine. Well, some courts and commentators have said that aesthetic functionality is like a misnomer, and they use the term competitive necessity. If you did that, would you, in your view, would you analyze the relevant market akin to how you might analyze it in an antitrust case? Yes. I mean, the relevant market in the Nike golf ball hypothetical is golf balls. It's not Nike golf balls. And the reason you might not be able to compete in the market for Nike golf balls is because Nike spent hundreds of millions, if not billions of dollars, advertising the Nike swoosh around the world, just like Rolex has. And people want that mark on their golf ball. But that shouldn't be a defense for trademark infringement. An infringer or counterfeiter shouldn't be able to say, well, I can't compete in the watch market because I can't put Rolex on my counterfeit watch. I have to put my name, Mr. Phillips, Phillips watches on that. That doesn't work. And then the fourth argument they make, which is confusing for judges who maybe don't know about the Patent and Trademark Office, is, well, Nike doesn't have a trademark registration in the class of golf balls. They only have it in shoes, apparel, and hats. And if you look at footnote seven of our opening brief, we cite the relevant authorities that trademark classifications are for the convenience of the United States Patent and Trademark Office only and that they don't limit one's trademark rights. And in fact, as your honors know, you don't even need a trademark registration to have a trademark. Trademarks are created by use. Trademark registrations help you with certain presumptions, but the fact that you may or may not have a trademark registration in a particular class is completely irrelevant. And those are the four arguments that they made to the district court that the district court bought. Now, briefly, I want to talk a little bit about our affirmative infringement case. We're not only asking that the court reverse the district court's entry of summary judgment in favor of automotile gold, but this court also, on appeal, grants summary judgment in favor of Volkswagen. There's no dispute about the facts. And as Professor McCarthy said, cases like this where you knock off a trademark are open and shut, and Volkswagen and Audi respectfully submit that the court need not go beyond the photos in our brief where we have the side-by-side comparisons. On the left, we have automotive gold's infringing product, and on the right, we have our Volkswagen and Audi trademarks and our competing product. And... Yes? Yes. Would your position be the same if they were selling cookies with the three circles on them? Well, that would fall under the sleek factors factors, and you'd have to go through those analysis. I would submit that we would have a trademark infringement claim, but it would not be as strong as if they're selling key fobs. The reason I ask that is obviously cookies are so far afield from autos, but are you saying that you only need to look at like for like here because you're in the range of product? That's correct. And, I mean, one of the interesting things that's happening now in the marketplace is people are trying to extend their brands. You have Nike, the swoosh for shoes, and they're now trying to extend their brand to golf balls. You have companies like General Motors that make cars now trying to extend their brand to coffee mugs and whatnot. And you've seen that brand extension in the marketplace, I'm sure, and it may very well be at some point in time Audi tries to extend its brand to cookies, and I don't know it. I'm not aware of anybody else who uses the four-ring logo with Audi, but if somebody put those on a cookies, we would have a claim against them, I think. It would be a harder claim than the one we're making here, but I still think we would have a claim. Could you explain something that's confusing in the record to me? When you're talking about your affirmative case, are you talking about your anti-dilution claim or a separate straight-up trademark infringement? Trademark infringement claim. And where? What happened to this anti-dilution claim? It says it was a typo, but it didn't seem the judge made the decision, as I understood it, well, when things got said and done, it's just not, it doesn't exist. What happened on that, Your Honor, is that there was a stipulation that was entered that dismissed counts three and four. Three was the consumer fraud. Four was intentional interference. There was also a counterclaim that had counts three and four that had a dilution. Our counsel below made a mistake and didn't realize what the court had dismissed and said, well, in any event, let us reinstate our dilution claim by amending our complaint, if it's not in the record. And then what happened is the court said, well, that would be futile to allow you to amend the case because I find that there's no consumer confusion. And the problem with the district court's analysis was consumer confusion is not an issue in a dilution case. So if, just hypothetically, if we took your argument as you've made it, if the court were incorrect about aesthetic functionality, the remedy you want is a direction of summary judgment in your favor on the regular infringement claim. Yes. And reinstatement of the dilution claim, or is that sort of water under the bridge at that point? Water under the bridge. We would just take the summary judgment on the trademark infringement claim. I think the court could do it on the dilution claim as well, but I don't think that's necessary. And if you look at the side-by-side comparison, there are several important factors there. First of all, we have our trademark registrations on the right-hand side. They have become incontestable because they've been around for five years. That means that there's a prima facie presumption that they're distinctive and that they have secondary meaning. The court knows that the Audi four rings and the Volkswagen logo are famous and distinctive marks. And under Vuitton, Vuitton holds that under Section 33A of the Lanham Act, an incontestable trademark registration shall be prima facie evidence of a registrant's exclusive right to use the registered mark in commerce. Another presumption that was presented to the district court is we have intentional copying. You can look at those photos and see that Automotive Gold intentionally and precisely copied our mark. Well, intentional copying gives rise to a presumption of secondary meaning. As Judge Roberts said in the Ford v. Lloyd case, the only reason they're knocking off the mark is because the mark has secondary meaning. And the final factor that's important is intentional copying. Under the AMF v. Sleetcraft, this Court has ruled that if somebody intentionally copies a trademark, there is a presumption, a legal presumption of confusion. And you can just go back. I don't mean to beat this, but it's – I'm still confused because in the judge's order, the judge rules against you on false designation of origin, which I assume is a Section 43A claim for unfair competition, declaratory judgment and interference with contracts. It says dismissed. You lose. But then it says defendant's counterclaims not included in the First Amendment counterclaims are dismissed with prejudice, and that includes trademark infringement. So when you're saying that you want us to even look at trademark infringement, this judge says they're not even in the case. The judge – Is that in the same situation as dilution? No, no, Your Honor. The judge entered summary judgment against us on trademark infringement. Well – And granted summary judgment in automotive gold's favor, saying that there was no trademark infringement because of aesthetic functionality. I'm just – the distinction I'm making is that he has two separate paragraphs, one where he says they're just dismissed, but then he says these are counterclaims not included in the First Amendment counterclaims, and those are dismissed too. So I'm just reading this, and I'm wondering, does that mean that the trademark infringement counterclaim is not part of the First Amendment counterclaim? No, it was part of the First Amendment counterclaim. And if you read the court's order, the court denies a summary judgment on our counterclaim and grants it in favor of automotive gold on their motion for summary judgment. I'm reading it. I'm looking at page 6 of the judge's order. So anyway, you have – maybe you want to reserve your remaining time for rebuttal, and you can take a look at the judge's order. This is the June 10 order. Thank you. May it please the Court. I'm Ken Cudon representing Automotive Gold. This is a case that was decided on a summary judgment on a full evidentiary record. Volkswagen had the burden of showing a genuine issue for trial on the question of trademark infringement, and they had to do that by establishing the existence of each element by a preponderance of the evidence. That's the standard that has been adopted throughout the country. They were required to present admissible evidence in support of their claim. The summary judgment motion issue was not filed until after the close of discovery, and several extensions had been given in order to allow the parties to conduct the discovery and complete it before the summary judgments were filed. And Volkswagen submitted one expert report, that of an expert on disclaimers, and they didn't present any surveys or any other evidence to show likelihood of confusion or actual confusion in the case. You need to do that when you have an absolutely identical mark? You don't need to do it, Your Honor, except under the case law. I would submit to the Court that although it may appear from their brief that the marks are identical, that's one of the facts that we established in the summary judgment record, and that is that we do not sell our products without the packaging. In other words, they're always packaged, and the packaging shows that automotive gold is far more prominently displayed than the Volkswagen mark. So whenever the package is used. But doesn't that beg the question? The question is, is the Volkswagen mark that's used identical to the federally registered incontestable mark of Volkswagen? I would say to the Court that the product itself does bear the Volkswagen marks and Audi marks. There's no question about that. Are they the same as the ones that are registered? Yes. Your point is that you have, you know, packaging and disclaimers and insulation in effect from confusion. Exactly. Well, not just that, Your Honor. That's true. But as we know, you look at trademarks in the context in which they appear in the marketplace, and in this particular marketplace, the trademark that appears is the automotive gold trademark when the product is sold. And that's the only point I'm making in relationship to that. Yes, Your Honor. Go ahead. You know, the problem with that is if I'm, you know, automotive yellow, and let's say I'm not selling license plate, I'm selling watches, and I say, you know, inside you're going to find a high quality good watch. And it doesn't say anywhere Rolex. And then you open it up and it's a Rolex. Somehow you're not precluded. You're not, you know, insulated from trademark infringement simply because you put it in a package and you didn't get to see it until you opened it up. So that's why I'm having trouble with that argument. And maybe there's some case law that I'm not familiar with you could point me to. I think that the case law that I'm alluding to here is the PetSmart case and also Sleek Craft in and of itself. In other words, in Sleek Craft, the way the product was presented in the marketplace, at least in some instances in that case, was Sleek Craft with the Sleek Craft logo. And the court said that if that had been true all of the time, it would have neutralized the confusing similarity of the Sleek Craft and Sleek Craft mark. Unfortunately, for Sleek Craft, it wasn't true all the time. But in the final analysis in Sleek Craft, the court did say that, yes, we find trademark infringement here, but we're going to limit it. We don't have identical marks there, Slick and Sleek. Pretty close. Right. So here's really the difficulty, it seems, that you have with your case. And I've been wrestling with the aesthetic functionality language, which you did a good job in your brief of laying that out. If we just take your argument as made, why would anyone ever have trademark protection? Because whether it's the Nike swoosh or the Louis Vuitton or the little Ralph Rampolo guy, we all like, you know, we buy those things because those have a cachet in effect. Right. And so your case is sort of the same. I mean, I could buy myself, I once had an Audi. I don't have any Audi anymore. But if I did, I could buy myself a license plate cover or I could buy one with the little circles because it would be a little more identifying with my car. But under your theory, aesthetic functionality is transformed into the eyes of the consumer, what they like, and I'm having trouble squaring that with the fundamental principle of trademark protection. I think, Your Honor, if I may mention the Clicks case, I think you've said it in that case, and that is that really it's a competitive issue when you come right down to it. In the Vuitton case, which is a very good example, you have a product where the signature of that product, that which makes it competitive in the marketplace, its differentiating factor, its product differentiation, is the Vuitton design, if you want to call it that, registered trademark. And what this Court said in both Vuitton, really, and in Clicks is that this is the basis upon which this company competes in the marketplace. If we let anybody imitate it, then they're going to lose the ability that the trademark gives them in the market in which they compete, that being their signature, the design. And so that's pro-competitive. In other words, trademark law, as it is typically used, is pro-competitive because it does allow for product differentiation. But you can still sell license plate holders, your client, and any manner of automotive accessories as long as they either have a license logo or they don't have a Volkswagen logo, correct? Well, that's correct. In other words, if a company licenses us, then we're absolutely free to sell it under the contractual terms and do. In this case, there was no company, I mean, excuse me, Volkswagen refused to license the trademark to us, and basically what that ended up with is a monopoly on the product. In other words, we're talking about evidence, of course, and the evidence showed that the market was, in effect, the license plate with the market on it, with the trademark on it. If this were, you know, as I hear that, I'd say, well, maybe you should sue them for any trust violation, but then you'd be into market definition and you'd be hard-pressed to find an expert who would say that the market here is licensed plates with Audi logos, because otherwise, anytime somebody has a logo and then you want to sell something with it, if you define the market to just your product, then you could always use their logo, couldn't you? Let's talk about market definition, because I think it's relevant in this case. Now, I don't, you know, we usually don't think in terms of trademark cases having the same parameters of market definition as antitrust, but in this case, we produced evidence from a person who'd been in the business for many, many years that, in fact, there was no cross-price elasticity of demand between the license plates that bear college identification, for example, and the license plates for Volkswagen cars. There's a reason for that, that this case is a little bit unusual, I should think, that nobody wants a Volkswagen license plate or a license plate frame unless they have a Volkswagen. But what about Starbucks? You know, that's kind of a nice mark. I like that. Why don't you make Starbucks license plates? Don't you think Starbucks would be on your doorstep? I'll let my client know. I think that the point is that it may be that it would appeal to some people. I don't know. I mean, it may have some degree of appeal to put on a license plate, but just as a college type of, you know, license plate does to some people who attended that And there are five companies that are in this business. And, in fact, what happened, and it's kind of interesting in this case, is that Volkswagen and Audi entered the market after we did, and basically in their ads and I shouldn't say ad, in the promotional literature that they attached to the declaration of a paralegal, they indicate in the ad that this is to dress up your car. In other words, this is a phenomenon. This is the kind of phenomenon that Job's Daughters was talking about, I think. And it's a merchandising phenomenon that, in effect, does become the market. Now, whether it is the complete cross-price elasticity of demand or there isn't, you know, we didn't do that in this case, but basically we had a witness who had been in the business for years who said that when people come in, this is what they want, the market is for these products, and it's a unique market. There's five companies competing in the market, and that if prices were raised on, for example, the college plates, it wouldn't have any impact on these. We get a premium for these plates. And basically the indicia that you would have in an antitrust case. Well, see, let me give you an example and figure out where your case fits on the spectrum. This is an appropriate example because today is Valentine's Day. And one of the examples used by the commentators is Valentine's Box. I'm sure you've read these examples where they say, okay, if you have a red Valentine's Box, somebody couldn't really tie up the market with a trademark on a red Valentine's Box because there's no other really a substitute for the Valentine, let's say. And so there's no other way to satisfy the aesthetic desire on the Valentine but to have the Valentine. Correct. And that's because the Valentine is a Valentine. In that case, they said that there was some, you know, aesthetic functionality to that Valentine's Box. But here the question is, you don't really have a Valentine, you don't have something that has no other way of being depicted. In other words, you have, because there the product was the box. But here the product is the license plate. And so somewhere between that box and then what you would consider just to be pure trademark infringement over here, let's say Exxon and Exxon, if I went out and started an Exxon Oil Company. So that's kind of pure, fanciful, arbitrary trademark infringement over here. So where between the Valentine's Box and Exxon does your case come and how does it fit within its aesthetic functionality? Well, that's a fair question, and I think I know the answer. Maybe. In Qualitex, the Court was grappling with this issue of functionality with respect to a color. And one of the cases that they cited with approval was a case involving John Deere. Now, from another case I was involved in, I have some knowledge of the farm tractor business. Me too. I used to. I had some John Deere cases, so I know what that looks like. Right. And it's yellow and green, correct? They all seem, all of the different companies, Harvester, Caterpillar, Deere, they have colors that are associated with their equipment. John Deere said our color green is unique in this business. In other words, it is a trademark. They asserted a trademark right in it. They said everybody recognizes the green John Deere tractor as ours. The Court, and this was not the Supreme Court, this was a district court, and it was affirmed by the Eighth Circuit, I might add, said, uh-uh. Green may be your color, but your competitors need that color because the consumers who buy these want them to match their equipment. In other words, they have to have green, too, because it matches. And the Supreme Court did countenance that case in Qualitex. And in essence, that is really what we have here. The benefit, that being in this instance, the product feature being the Volkswagen or Audi mark that the consumer wants is in order to match the license plate with the Volkswagen car. In some ways, I think it could be said that Volkswagen benefits from it. In reality, because once it goes on the car, it's another advertisement for a Volkswagen. And the hubcap's the same thing? If I'm an aftermarket hubcap seller for multiple companies and I put the Volkswagen mark on it? I think not. I think not. And the reason I think it isn't the same is because the market has developed in that industry, and there are a variety of different marks that the consumer has appeared to accept as being substitutes. So you get into the competitive substitute issue there again. I think that's true of a lot of products. But if I sell floor mats for cars, and some of those cars have, like, VW or, you know, Mercedes or whatever, and you put them on your floor, they're kind of raised in the carpet of your floor mat, those portable floor mats, would that also, why wouldn't that, you'd be able to sell those and say, well, people, if they want to get a floor mat that's identified with their car, you have to get it with the right logo. And I think that. Would that be aesthetic functional as well? I think that that is a, at least one judge who happens to sit in this court, has said that it is and accepted that. There may be an argument that with floor mats, too, there, and I don't, I haven't studied the industry, but it could be that there is competition that would make that a situation more akin to the Klicks Billiards or the Vitone. But I think in this particular. I don't understand what the competition would be here other than if you, you know, you have Audi selling license plates with the little circles. You sell them. And other companies. Pardon? And other companies. Right. And what the benefit is, and this is where the consumer protection issue, I mean, aspect of the case comes in, is that provided, of course, that the public is aware and is made aware that these are different companies selling these products, the consumer is going to ultimately get more of a variety and better, lower prices. But that's true. I could take any clothing product and knock it off in China and say now the consumer is better off because they get lower prices. And in my view, they get the same quality as the Ralph Lauren shirt, which is also made in China. I think it goes to the issue of functionality in this case. So I wouldn't. But what consumers like, it's not the red sweater or the material so much. They like that little logo. Yes. So why is that different than Audi? I think it is. I'm just trying to understand this. Okay. It's hard to get my head around, okay? Well, it really is fact intensive. Because what it really is all about is what the consumer demands. I mean, do I know why consumers demanded green competitive farm equipment? No. I don't know the answer to that question. But apparently consumers do, for one reason or another, create markets. And that has happened in this particular industry. I mean, we're talking about license tags, license frames, key chains. And the consuming public is the one that is making that choice as to what it is that they want to match their car. It's somewhat of a phenomenon, I think. But it's been going on for quite a long time in this particular market segment. Can you think of any other market segment or trademark that falls in this category that you're describing? Well, of course I can think of Job's Daughters. Right. I mean, one that's kind of like current day, like you go out in the street and see all these trademarks. Well, there have been, you know, there have been cases. And I think that this is an interesting read on it. There have been cases involving these symbols for football and hockey teams. And, of course, Job's Daughters harshly criticized the Fifth Circuit in the Hockey League case because of the way in which they established confusion in the marketplace. But there is another case that came down. And, unfortunately, I don't remember the name of it. But it involved the same issue. In other words, the, I think it was football badges that were being sold. And the court basically said that it really comes down to here, is this a product in which the consumer really thinks about who bought, who sold it? In other words, who the manufacturer is or who the sponsor is. And so the football, I think it was the NFL, came in and said, okay, we have a survey that establishes that people do, in this case, think that these badges come from us or are sponsored by us. And that's what we are advocating in this case, in effect. That didn't happen here. But that, it would seem to me, is a more solid way of approaching this. If you can establish a prima facie case of functionality, and I think we have here, then the real question becomes, do the consumers care where they're buying it from? Because that's the issue.  Thank you. Your Honor, there is some confusion in the record on whether there was an affirmative summary judgment claim by Volkswagen. But if you look at excerpt of record 413, which is the judge's order on the motion for summary judgment on page 3, he talks about the motions for summary judgment. And A is plaintiff's motion for partial summary judgment, and then B is defendant's motion for summary judgment. I see that. Okay. So that was an issue. With respect to Judge Kaczynski's infamous opinion in Plasticolor, Judge Kaczynski, after further reflection, said, never mind about that opinion. And we've cited that law review article. And the reason he said, never mind, and the point that I think this appeal brings really home, is aesthetic functionality is a seductively appealing argument. But it rips the heart right out of the Lanham Act. It allows the counterfeiter of a Rolex watch to say, the trademark I put on that watch serves an aesthetic function. It dresses up the person. And therefore, Rolex shouldn't have a claim. And that's what the argument is here. Volkswagen and Audi should not be able to enforce their trademark registrations because those logos dress up their vehicles, the owner's vehicles. We're not using it to indicate source. We're using it to perform the aesthetic function. And this Court said in six billiards that aesthetic functionality is the antithesis of that and can't be used for that. And so if you carry Mr. Kudon's argument to its logical conclusion, it really rips the heart out of the Lanham Act and provides refuge for counterfeiters. And they'll never – famous trademark holders like Volkswagen and Audi will never be able to enforce their marks if that doctrine remains viable. Thank you. Thank you. Thank you both, both for the briefs and for the argument, a very good argument. And the case of automotive gold versus Volkswagen is submitted. We're adjourned.
judges: Alarcon, McKeown, Holland